1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | | |
|---|---|---|
| 11 NAKEESHA PAYNE, | ) | |
| 12         **Plaintiff,** | ) | Case  No. CV 09-06141 AJW |
| 13      **v.** | ) ) | **MEMORANDUM OF DECISION** |
| 14 MICHAEL J. ASTRUE, Commissioner of the Social | ) ) | |
| 15 Security Administration, | ) ) | |
| 16         **Defendant.** | ) ) | |
| 17 —————————————————— | ) | |

18    Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the

19 Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance

20 benefits and supplemental security income ("SSI") benefits.  The parties have filed a Joint Stipulation ("JS")

21 setting forth their contentions with respect to each disputed issue.

22                                                    **Administrative Proceedings**

23    The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation.

24 [See JS 2]. In a written hearing decision that constitutes the Commissioner's final decision in this matter,

25 an Administrative Law Judge (the "ALJ") found that plaintiff had severe impairments consisting of lumbar

26 strain, ankle strain, mood disorder, and mixed personality with borderline and narcissistic personality

27 features.  The ALJ found that retained the residual functional capacity ("RFC") to perform medium work

28 with occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and that she is limited

1  to simple, repetitive tasks.  [JS 3; Administrative Record ("AR") 161].  The ALJ concluded that plaintiff

2  was not disabled because her RFC did not preclude her from performing jobs available in significant

3  numbers in the national economy.  [JS 2; AR 161-162].

4  **Standard of Review**

5        The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial

6  evidence or is based on legal error. Stout v. Comm'r Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.

7  2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  "Substantial evidence" means "more than

8  a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.

9  2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

10 Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is

11 required to review the record as a whole and to consider evidence detracting from the decision as well as

12 evidence supporting the decision.  Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

13 Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999).  "Where the evidence is susceptible to more than

14 one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

15 Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.

16 1999)).

17 **Discussion**

18 **Examining physician's opinion**

19       Plaintiff contends that the ALJ failed properly to consider the opinion of the Commissioner's

20 consultative examining physician, board-certified psychiatrist Steven Simonian, M.D.  [See JS 4-18].

21       Dr. Simonian conducted a complete psychiatric evaluation of plaintiff in May 2005 and again in

22 December 2005.  [AR 298-302, 375-379].  Plaintiff was 28 years old at the time of both evaluations. [AR

23 298, 375].  During the May 2005 evaluation, Dr. Simonian elicited a history and conducted a mental status

24 examination. [AR 298-302].   His examination report includes the following observations and findings.

25       Plaintiff was not a good historian. [AR 298].  She said that she was living in a homeless shelter in

26 Palmdale.  She received general relief.  She reported that she stopped working in a warehouse in Long

27 Beach, where she used to live, because she was constantly anxious.  She heard voices and thought others

28 were talking about her. She subsequently began seeing a psychiatrist, who prescribed medication. Plaintiff

1  was taking Risperdal 4 milligrams and Lexapro, and she said that the voices seemed to have stopped. [AR

2  298].

3        Plaintiff attended school up to the tenth grade. She was unmarried and did not have children. She

4  denied a history of alcohol abuse or substance abuse. [AR 299]. She said that she did not drive and did not

5  have friends. [AR 301]. Her father was dead, she had a brother, and she did not know her mother's

6  whereabouts. [AR 299].

7        On mental status examination, plaintiff was alert and oriented times three. She was shabbily dressed;

8  her clothes were torn and worn out. [AR 300, 301]. Her hygiene, however, was good. [AR 300]. She had

9  no major speech disorder. Her thought process was somewhat tangential. It was difficult to obtain a

10  chronological history of her present illness. Plaintiff said that she become suspicious around people. She

11  felt that they were accusing her of being a lesbian or were ordering her to touch herself, but she said that

12  the voices had stopped since she started taking medication. Plaintiff denied suicidal or homicidal ideation.

13  Her affect was constricted, and her mood was rather guarded. She was tearful at times during the interview.

14  Her intellectual functioning and memory for recent and remote events were intact and average. Her ability

15  to perform simple calculations was poor, and her general fund of knowledge was below average. Judgment

16  was poor. [AR 300].

17        Dr. Simonian's diagnoses were "mood disorder NOS with psychotic features in partial remission,"

18  and "[r]ule out schizoaffective disorder." [AR 301]. Dr. Simonian assessed plaintiff's work-related

19  functional abilities as follows. Plaintiff was not limited in the ability to remember, understand, and carry

20  out simple one- or two-step job instructions and to maintain concentration and attention for a period of time.

21  [AR 301]. Plaintiff was moderately limited in the ability to remember, understand, and carry out complex

22  instructions; relate and interact with co-workers, supervisors, and the public; associate with day-to-day work

23  activity, including attendance and safety; adapt to the stresses common to a normal work environment;

24  maintain regular attendance in the workplace; perform work activities on a consistent basis; and perform

25  work activities without special or additional supervision. [AR 301]. Dr. Simonian opined that plaintiff was

26  able to handle her own financial affairs. [AR 302].

27        During his December 2005 examination, Dr. Simonian again obtained a history and conducted a

28  mental status examination. He also reviewed plaintiff's responses to a questionnaire that she completed in

his office with the assistance of office staff.  Plaintiff answered most questions "I don't know" or "I don't remember, " so Dr. Simonian relied in part on the history given during her prior examination. [AR 375]. He remarked that plaintiff was not a good historian and was somewhat reluctant to answer questions.  [AR 375].

Plaintiff reported that she had been seeing Dr. King at a Palmdale outpatient psychiatric clinic for 3 months and was taking Risperdal 3 milligrams daily.  She said that she previously had seen a psychiatrist in Orange County. [AR 376].  Dr. Simonian noted that during this interview, plaintiff told him that she had never worked, but she previously told him that she had worked in a warehouse in Long Beach.  Plaintiff said that she supported herself by recycling cans, panhandling, and receiving general relief.  Plaintiff said that she had a brother and a sister, and that her mother was alive, but that she was not close to any of them. She denied any history of alcohol or drug abuse. [AR 376].

On mental status examination,  plaintiff was alert and oriented times three.  She was shabbily dressed; her clothing was "torn and run down." [AR 377].  Her behavior was "rather demanding," and she exhibited an "entitled attitude," in that she said she was in a hurry and had to catch a bus or she would not arrive on time for her shelter.  [AR 375, 377].  Her hygiene was good. [AR 377].  Speech was normal. Thought processes were coherent.  There was no tangentiality or looseness of association. Her affect was somewhat guarded, but appropriate to the content of discussion.  Her mood was rather demanding, antagonistic, and unhappy.  Psychomotor activity was normal.  She claimed that she heard voices, but she was not distracted by internal stimuli during the interview.  Plaintiff comprehended questions and responded relevantly, though she often said that she did not know.  She did not exhibit delusional thinking. She denied suicidal or homicidal ideation.  Her intellectual functioning was difficult to evaluate due to her rather uncooperative state and her unwillingness to make the effort to do the cognitive tests.  However, her memory for recent and remote events was judged to be intact and average.  Her comprehension and abstract thinking were intact. [AR 377-378]. Her ability to perform simple calculations was poor.  Her judgment was poor. [AR 378].

Dr. Simonian's psychiatric diagnosis was "mood disorder NOS." He also opined that plaintiff had mixed personality disorder with borderline and narcissistic personality features. [AR 378].  Dr. Simonian assessed the following work-related mental functional limitations.

Plaintiff was not limited in the ability to remember, understand, and carry out simple one- or two-step job instructions.  [AR 378].  She was mildly limited in the ability to associate with day-to-day work activity, including attendance and safety. [AR 378].

Plaintiff was moderately limited in the ability to remember, understand, and carry out complex instructions; relate and interact with co-workers, supervisors, and the public; to maintain concentration and attention on a persistent basis; adapt to the stresses common to a normal work environment; maintain regular attendance in the workplace; perform work activities on a consistent basis; and perform work activities without special or additional supervision. [AR 378-379]. Considering plaintiff's "poor judgement and poor ability to count," plaintiff could not take care of her own financial affairs and would require a payee for benefits. [AR 379].

The ALJ said that he gave "significant weight" to Dr. Simonian's conclusions because he had examined plaintiff, and his conclusions were consistent with the objective findings and the evidence of record. [AR 159].  On that basis, the ALJ found that plaintiff had mild to moderate restriction of activities of daily living; mild to moderate difficulties maintaining social functioning; mild to moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  The ALJ found that plaintiff could perform simple, repetitive tasks at the medium exertional level, with only occasional postural activities. [AR 159].

Plaintiff contends that although the ALJ said that he gave Dr. Simonian's opinion significant weight, the ALJ's RFC omits important limitations and diminishes the severity of plaintiff's mental impairment as assessed by Dr. Simonian. [See JS 9].

In general, "[t]he opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see 20 C.F.R. §§ 404.1502, 404.1527(d)(2), 416.902, 416.927(d)(2). An examining physician's opinion, in turn, generally is afforded more weight than a non-examining physician's opinion. Orn, 495 F.3d at 631; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). If contradicted by the opinion of another doctor, a treating or examining physician's opinion can be rejected only for specific and legitimate reasons that are based on substantial evidence in the record.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); Tonapetyan v. Halter, 242 F.3d 1144,

1148-1149 (9th Cir. 2001); Lester, 81 F.3d at 830-831. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Lester, 81 F.3d at 831.

Plaintiff contends that the ALJ's findings that plaintiff had "mild to moderate" limitations and can perform simple, repetitive tasks fail to take into account the fact that Dr. Simonian opined that plaintiff had "moderate" limitations in multiple areas of functioning. Plaintiff also argues that the ALJ's RFC finding fails to account for several work-related limitations not addressed by the four broad functional categories (activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation). [JS 9].

Plaintiff's argument fails. First, the ALJ said he was giving Dr. Simonian's opinion "significant weight," but he did not say that he was adopting that opinion in every respect. The ALJ also relied in part on a non-examining physician state agency physician's opinion that plaintiff retained the mental RFC to perform simple, repetitive tasks. [AR 158 (citing AR 411)]. Both the state agency physician and the ALJ noted multiple discrepancies in plaintiff's presentation to examining doctors, as well as indications that plaintiff submitted purported medical opinion evidence of doubtful authenticity.[1] [See AR 159, 409-411].

Second, in framing his hypothetical question to the vocational expert, the ALJ specified that he was using a mental limitation rating scale of "slight, to mild, to moderate, to marked." [AR 697]. Thus, "mild to moderate" limitations denotes a range bounded by "mild" on one end and "moderate" on other. It encompasses, rather than excludes, the possibility that plaintiff had moderate functional limitations. The vocational expert testified that a hypothetical individual with the "mild to moderate" functional limitations identified by the ALJ could perform the unskilled, light or medium jobs of cleaner, assembler, packager,

---

[1]    As noted by two state agency non-examining physicians and the ALJ, the "Short-Form Evaluation for Mental Disorder" forms dated June 1, 2005 [AR 319-320] and September 22, 2005 [AR 372-373] contained flagrant spelling and syntax errors that suggest that those forms were not completed by a physician. [See AR 159, 409, 411]. Dr. Hood, a state agency physician, placed a call to the phone number provided on the June 2005 form, which was signed by "Nancy Coles" with the title "Psychiatrist." Dr. Hood reported that the phone number did not belong to a mental health facility or a social worker, but instead was a private number. Dr. Hood also called the Palmdale Mental Health Center, a Los Angeles County mental health facility, but was told that no physician named Nancy Coles worked there. [AR 159, 409].

1    and inspector. [AR 697-698].

2         Third, even if, plaintiff has moderate limitations with respect to executing complex  instructions,

3    interacting socially at work, adapting to common work stresses, attending work regularly, and performing

4    work activities on a consistent basis without special or additional supervision, moderate mental functional

5    limitations are not per se disabling, nor do they preclude the performance of simple, repetitive work. See,

6    e.g., Hoopai v. Astrue, 499 F.3d 1071, 1076-1077 (9th Cir. 2007) (holding that a diagnosis of "moderately

7    significant forms of depression"and moderate limitations in the ability to maintain attention and

8    concentration for extended periods, perform activities within a schedule, maintain regular attendance, be

9    punctual within customary tolerance, complete a normal workday and workweek without interruption from

10   psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and

11   length of rest periods did not preclude a finding of nondisability); Thomas, 278 F.3d at 953 (affirming the

12   ALJ's finding that a claimant who had "moderate mental residual functional capacity limitations" as well

13   as a "marked limitation in her ability to maintain concentration over extended periods" could perform the

14   unskilled jobs identified by a vocational expert; Barker v. Sec'y of Health & Human Servs., 882 F.2d 1474,

15   1475-1478 (9th Cir. 1989) (holding that the ALJ did not err in finding that a claimant with a "low-normal

16   IQ," a moderate restriction in the activities of daily living, and moderate difficulties in social functioning

17   could perform the unskilled jobs identified by a vocational expert); Russey v. Massanari, 2001 WL

18   1242901, at *2, *10 (N.D. Ill. Oct. 12, 2001) (holding that the ALJ properly found that a claimant who was

19   moderately limited in his ability to understand, remember and carry out detailed instructions, and to get

20   along with peers and coworkers without distracting them or exhibiting behavioral extremes, and markedly

21   limited in his ability to interact appropriately with the general public, could perform unskilled jobs); see also

22   Koehler v. Astrue, 283 Fed.Appx. 443, 445 (9th Cir. 2008) ("The regulatory scheme–specifically, 20 C.F.R.

23   § 404.1520a–does not mandate that the diagnosis of a 'moderate' degree of limitation in one's ability to

24   respond to changes in the workplace setting must be found to be a [severe] mental impairment.").

25        Fourth, the ALJ's finding that plaintiff can perform simple, repetitive work—and therefore is not

26   precluded from performing the unskilled jobs identified by the vocational expert—is consistent with Dr.

27   Simonian's finding that plaintiff can perform simple one- and two-step job instructions (but would have a

28   "moderate limitation" in understanding, following, and carrying out complex instructions). [See AR 161,

301, 378].  The vocational expert testified that the hypothetical person could perform the unskilled jobs of cleaner, assembler, packager, or inspector.  While the vocational expert did not provide a <u>Dictionary of Occupational Titles</u> ("<u>DOT</u>") job number for those jobs, there are several such jobs in the <u>DOT</u> at the medium exertional level or below  that entail only occasional postural activities and require no more than the ability to "apply commonsense understanding to carry out *simple one- or two-step instructions*.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  <u>See</u> <u>DOT</u>, Appendix C, Components of the Definition Trailer (4th ed. rev.1991)(italics added).[2]

For the foregoing reasons, the ALJ did not err in evaluating Dr. Simonian's opinion, and his finding that plaintiff retains the RFC to perform alternative work is supported by substantial evidence in the record.

**Conclusion**

The Commissioner's decision is supported by substantial evidence and is free of legal error. Accordingly, the Commissioner's decision is **affirmed.**

**IT IS SO ORDERED.**

November 8, 2010

_____
ANDREW J. WISTRICH
United States Magistrate Judge

[2]    Examples of such unskilled jobs are Cleaner, Housekeeping, <u>DOT</u> job number 323.687-014 (light); Cleaner, Wall, <u>DOT</u> job number 381.687-026 (medium); Camouflage Assembler, <u>DOT</u> job number 869.687-014 (light); Switchbox Assembler I, <u>DOT</u> job number 722.687-010 (light); Peeled Potato Inspector, <u>DOT</u> job number 521.687-094 (light); and Dowel Inspector, <u>DOT</u> job number 669.687-014 (sedentary).